2016 IL App (4th) 140942
NO. 4-14-0942

FILED
February 17, 2016
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| TORIA N. JONES, | ) | Appeal from |
|       Plaintiff-Appellee and | ) | Circuit Court of |
|       Cross-Appellant, | ) | Sangamon County |
|       v. | ) | No. 12MR968 |
| THE DEPARTMENT OF HEALTHCARE AND | ) | |
| FAMILY SERVICES, | ) | |
|       Defendant-Appellant and | ) | |
|       Cross-Appellee, | ) | |
|       and | ) | |
| THE CIVIL SERVICE COMMISSION; CHAIRMAN | ) | |
| OF THE COMMISSION, CHRIS KOLKER; | ) | |
| COMMISSIONER ANITA M. CUMMINGS; | ) | |
| COMMISSIONER ARES G. DALIANAS; | ) | |
| COMMISSIONER SUSAN KREY; and | ) | Honorable |
| COMMISSIONER GARRET P. FITZGERALD, | ) | John P. Schmidt, |
|       Defendants. | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.
Presiding Justice Knecht and Justice Turner concurred in the judgment and opinion.

**OPINION**

¶ 1      From April 2001 to December 2009, plaintiff, Toria N. Jones, was employed by the State of Illinois in the Department of Human Services (Human Services). In January 2010, she accepted a position with defendant, the Department of Healthcare and Family Services (Department). In March 2012, the Department terminated Jones' employment after receiving the results of an investigation that found Jones committed numerous policy violations throughout 2008 while employed with Human Services.

¶ 2        Later that month, Jones filed a written request for a hearing before the Civil Service Commission (Commission) (Civil Service Commission case No. DA-46-12). The Commission adopted the findings of the Administrative Law Judge (ALJ), and determined Jones committed multiple acts of misconduct that warranted termination. In November 2012, Jones filed a complaint for administrative review in the circuit court of Sangamon County. The court upheld the Commission's finding of misconduct but determined termination was too severe and remanded the case to the Commission for imposition of a lesser sanction. In July 2014, the Commission issued Jones a 90-day suspension, which the court upheld in September 2014.

¶ 3        The Department appeals, asserting the Commission properly discharged Jones. Jones cross-appeals, arguing (1) the Department's claim should be barred by the doctrine of *laches*, (2) insufficient evidence existed to support the Commission's findings of misconduct, and (3) the findings of misconduct were inadequate to support just cause to discharge her from employment. We note the Commission and its commissioners are not parties to this appeal. For the following reasons, we (1) reverse the circuit court's order remanding the case to the Commission for imposition of a lesser sanction, (2) vacate the Commission's subsequent 90-day suspension sanction, and (3) affirm the Commission's original order discharging Jones.

¶ 4                                I. BACKGROUND

¶ 5        In April 2001, Jones began working for Human Services. Her responsibilities included determining whether clients qualified for Supplemental Nutrition Assistance Program (SNAP) benefits and Temporary Assistance for Needy Families (TANF) benefits. If authorized, the State releases funds onto a Link card provided to the client. SNAP benefits are used to pay for specific food-related items. TANF benefits, on the other hand, are unrestricted cash benefits placed on a Link card as a form of reimbursement, such as for transportation or childcare costs.

While working with Human Services, in 2006, Jones provided an emergency-contact form listing Charlene Poindexter as a friend and Betty Bridges as her aunt. Jones explained she had no other family in Illinois to serve as her emergency contacts, and had no real personal connection with either contact.

¶ 6        Jones remained in Human Services through December 2009, at which time she transferred to the Department. Jones testified she sought a position with the Department due to ongoing issues with Human Services' local office administrator, Gayle Strickland, against whom Jones had filed several complaints. While with the Department, Jones was responsible for coordinating interstate child-support orders, which consisted of her transmitting court orders to the appropriate out-of-state courts for enforcement.

¶ 7        At the time Jones transferred from Human Services to the Department, the Illinois State Police and the Office of the Executive Inspector General were investigating whether Jones engaged in misconduct while employed by Human Services. In September 2011, the Department learned of the investigation into Jones' alleged misconduct at Human Services. Based on the investigative report, the Department filed a statement of discipline containing the following allegations of misconduct in violation of Human Services' policies.

¶ 8                    A. Statement of Discipline

¶ 9                    1. *Charges*

1. Jones improperly authorized benefits for friends and/or relatives. She also acknowledged, after improperly authorizing those benefits, she admitted using the Link cards of those friends or relatives for personal use. Specifically, the charge alleged, she

- 3 -

improperly authorized benefits for relatives of Charlene Poindexter and Betty Bridges, whom she listed as her emergency contacts.

2. Jones used and accepted a friend or relative's Link card.

3. Jones authorized benefits for Jacqueline Bridges, a relative.

3(a). In September 2008, Jones improperly authorized $426 in monthly SNAP benefits for Antoinette Burts, Charlene's daughter.

3(b). In May 2008, Jones improperly authorized $109 in SNAP supplemental benefits for Kiewann Poindexter, Charlene's daughter and Jones' former coworker from Kohl's Department Store.

3(c). In March 2008, Jones improperly authorized $378 in SNAP benefits and $353 monthly SNAP benefits for Danita Phillips, Charlene's friend and former coworker.

3(d). In September 2008, Jones improperly authorized $241 in supplemental SNAP benefits for Jacqueline Bridges, Betty's daughter.

3(e). In August 2008, Jones improperly authorized $136 in supplemental SNAP benefits for Edwin McGee, the father of Betty's great-granddaughter.

3(f). In September 2008, Jones improperly authorized $215 in supplemental payment benefits for Jeanell Gaston.

- 4 -

3(g). In November 2008, Jones improperly authorized (1) TANF cash benefits, (2) $410 in TANF transportation benefits, (3) $638 in TANF childcare benefits, (4) $442 in supplemental TANF childcare benefits, and (5) $335 in SNAP benefits for Frances Williams, Jones' high school classmate.

3(h).  In October 2008, Jones improperly authorized $565 in disaster SNAP benefits for Dennis Tisdale, her son's paternal uncle.

4. Jones violated Human Services' policies "by engaging in conduct that constituted a conflict of interest when she authorized assistance, benefits, and/or services for individuals [with] whom she had a personal connection, that were not eligible to receive the benefits given."

5. Jones violated Human Services' policies and failed to follow instructions "when she failed to seek supervisory approval to authorize benefits to individuals [with] whom she had a personal and/or family connection."

6. Jones "failed to document many transactions and she failed to explain the reasons why she made decisions to authorize benefits which were improperly approved."

¶ 10                              2. *Policies Violated*

¶ 11        Below the list of charges, the Department outlined the Human Services' policies and procedures Jones allegedly violated.  Those relevant to this appeal include:

(1) The Medical Policy Manual (Manual) section 01-04-00, which requires caseworkers to "[k]eep an up-to-date case record for each person who applies for or receives benefits." These case notes must include "a record of all actions taken concerning each application [and] the reason(s) for approval or denial of the application."

(2) Manual section 21-05-02, which requires caseworkers to obtain supervisory approval before authorizing TANF transportation payments.

(3) Manual section 21-05-01, which requires caseworkers to obtain supervisory approval before authorizing TANF childcare payments.

(4) Human Services' Workers' Action Guide (Guide) section 01-04-03, which requires caseworkers to "record any action taken or information (including client contacts) received for each active case and each action affecting the amount of payment or eligibility."

(5) Human Services' Employee Handbook (Handbook) section V, subsection entitled Performance of Duties, which requires caseworkers to follow Human Services' rules and regulations in the performance of duties.

(6) Handbook section V, subsection entitled Employee Interaction with Clients, which prohibits employees from accepting

gifts—any item having monetary value—from a client or client's relative for personal use.

(7) Handbook section V, subsection entitled Employee Personal Conduct, which prohibits employee from authorizing assistance, benefits, or services to relatives, or from redetermining eligibility for services for relatives.

¶ 12        The statement of discipline also noted Jones had received counseling in October 2011 for excessive tardiness and corrective action in November 2011 due to poor job performance.

¶ 13                        3. *Predisciplinary Proceedings*

¶ 14        The Department provided Jones with the charges in January 2012 and held a predisciplinary hearing later that month. After determining Jones' evidence was insufficient to rebut the charges, the Department discharged Jones effective March 1, 2012.

¶ 15                        B. Administrative Proceedings

¶ 16        In March 2012, Jones filed a written request for a hearing. Later that month, the ALJ began hearing evidence. The Commission ultimately determined charges 3(e), 3(f), and 3(h), which alleged Jones improperly authorized benefits for McGee, Gaston, and Tisdale, were not proved; thus, we will not discuss the evidence as it relates to those individuals. Moreover, under charge 3 and its subsections, the Commission determined the Department failed to prove Jones committed wrongdoing with respect to the amounts authorized for each individual. That issue has not been raised on appeal and we will not address it.

¶ 17        According to Jones, in May or June 2009, Strickland called Jones into her office where Illinois State Police officers read her rights. Jones immediately requested an attorney and

- 7 -

was not provided with any information regarding potential charges against her. In May 2010, after transferring to the Department, Jones was interviewed by Reginald Spears and Tiffany Pryor-Williams from the Office of the Executive Inspector General. During the course of the investigation, Spears interviewed Jones and Strickland numerous times. He did not interview any of the individuals who allegedly received improper benefits.

¶ 18       Terri Shawgo, the Bureau Chief over the Office of Labor Relations and the Bureau of Training for the Department, testified she drafted the charges against Jones as part of her responsibilities. She said it was uncommon, but not unheard of, to discharge an employee based on misconduct in another State department. In this instance, Shawgo noted the Department was unaware of Jones' misconduct at Human Services when the Department hired her. In reaching her recommendation for discharge, Shawgo stated she did not blindly accept the recommendations of the Office of the Inspector General but reached her own conclusions after considering the documentation provided by the inspectors, Jones, and other individuals involved.

¶ 19       The ALJ questioned Shawgo extensively over the charges, noting some were vague or redundant. Shawgo explained charge 3 and its subparts related to improper authorizations of benefits, whereas charge 4 related to conflicts of interest, charge 5 related to lack of supervisory approval, and charge 6 was for failing to provide the proper case notes. Shawgo also acknowledged the vague language in charges 4, 5, and 6 related to the recipients discussed in charge 3 and its subparts. When the ALJ asked if Jones understood the line of inquiry, Jones stated she did.

¶ 20       C. Evidence During Administrative Proceedings

¶ 21       1. *Concerns Over Delay*

- 8 -

¶ 22    The charges contained in the statement of discipline reflect ongoing allegations of misconduct throughout 2008. Strickland testified she provided information to the inspectors and the Illinois State Police in late 2008. The Illinois State Police investigated the case until January 2010, at which time the Office of the Executive Inspector General began its own investigation. Spears testified he could not begin his investigation until the Illinois State Police investigation ended because the investigations might lead to conflict between the organizations. Spears then disclosed his report to the Department in September 2011, which conducted its own investigation and terminated Jones' employment in March 2012.

¶ 23    In some instances, witnesses, particularly Strickland and the investigators, had difficulty recalling statements made during the pendency of the investigation without referring to various notes to refresh their recollections. Similarly, Jones, at times, stated the lengthy delay impacted her ability to remember certain details or to access documentation to aid in her defense.

¶ 24    Jones also asserted Strickland manufactured the delay due to her bias against Jones. Jones testified this stemmed from Jones, along with other coworkers, filing a grievance in November 2009 for overtime pay, which was resolved in the employees' favor. She also testified regarding a January 2009 incident in which she filed a complaint against Strickland for screaming at her. Spears' investigation found no evidence of bias on behalf of Strickland.

¶ 25                    2. *Charges 1 and 2*

¶ 26                        a. The Evidence

¶ 27    Shawgo explained charge 1 served primarily to summarize the charges against Jones. Charges 2 through 6 provided more specific charges. As to charge 2, which alleged Jones improperly used a friend's or relative's Link card, the evidence arose from two separate incidents. The first incident involved the purchase of large cookie cakes for an office party.

¶ 28        On February 15, 2008, Human Services had an office party at noon, and Strickland specifically recalled Jones bringing two cookie cakes to the party. After the party, Strickland testified an employee brought her a receipt discovered in an employee-only area of Human Services. The receipt showed a Link card had been used to purchase two cookie cakes at 11:55 a.m. that day. Upon further investigation of the Link card number on the receipt, Strickland determined the cookie cakes had been purchased on a Link card belonging to Adrean Burts. Human Services' records revealed Adrean dropped off an application for benefits that same day. Based on this information, Strickland suspected Jones used Adrean's Link card to purchase the cookie cakes. After receiving the receipt, Strickland sent an e-mail to Jones inquiring when Jones purchased the cookie cakes. Jones responded, stating she purchased them the evening before the party.

¶ 29        On cross-examination, Jones asked Strickland how a person could have purchased the cookie cakes at 11:55 a.m. at a store located 20 minutes away, yet still arrive on time for the office party at noon. Though Strickland could not recall any other facts about the party, including her own contribution, she said she specifically remembered Jones being the only person who brought cookie cakes to the party and that Jones arrived 15 to 20 minutes late.

¶ 30        During Jones' first interview with Spears in May 2010, Spears stated Jones could not recall how she paid for the cookie cakes but acknowledged it was possible they were purchased on a Link card. Jones testified she initially acknowledged the possibility that Charlene purchased the cookie cakes on a Link card, but reviewing her e-mail exchange with Strickland refreshed her recollection that she purchased the cookie cakes the evening before.

¶ 31        Jones denied using a Link card to purchase the cookie cakes. She also explained she would not have used Adrean's Link card to purchase the cookie cakes. She described their

relationship as being that of acquaintances, and that he had visited her house only four times. However, in a verified petition for an order of protection (Will County case No. 07-OP-599) filed by Jones against Adrean, Jones described Adrean as an ex-boyfriend. She testified she believed that meant he was an ex-friend who happened to be male. The petition also stated Adrean resided with Jones. Jones stated that was a lie she told for the purposes of ensuring Adrean could not avoid service. In the petition, Jones stated, in April 2007, Adrean "came home intoxicated" and checked the caller identification on her phone, which was "very common" for him to do. He then proceeded to batter her.

¶ 32    As to the second incident, according to Spears, Jones admitted she had used a Link card provided to her by Charlene to buy a beverage for her son. Spears admitted he conducted no further investigation into whether or when Jones used another individual's Link card. Though Spears had difficulty remembering many details of the interview without referring to his notes, he specifically recalled Jones admitting using another individual's Link card to buy a beverage for her son. Similarly, Pryor-Wallace recalled Jones admitting using another's Link card. She had no independent recollection of Jones admitting she used a Link card provided by Charlene without referencing her report.

¶ 33    William Noble, Jones' union steward and a child-support specialist with the Department, accompanied Jones on her interviews with Spears. He stated Jones emphatically denied using Adrean's Link card to buy the cookie cakes. He also believed Jones' statement regarding using a Link card to buy a beverage was taken out of context. His recollection was that Jones was standing near the register and agreed to "swipe" the Link card for the person in front of her in line; that person then gave Jones a beverage.

¶ 34    Charlene testified she had never supplied Jones with a Link card or seen Jones use anyone's Link card. She said she knew Jones from working with her at Kohl's and Fashion Bug, but she did not consider her a "friend" with whom she socialized. Because of their limited association, Charlene was surprised Jones listed her as an emergency contact. She also stated Jones was not friends with any of Charlene's children. Jones denied using another person's Link card to purchase items for herself.

¶ 35    b. The Commission's Finding

¶ 36    As to charges 1 and 2, the Commission acknowledged Strickland's pursuit of Jones was overzealous. However, Jones lacked credibility in her attempt to downplay her relationship with Charlene, Betty, and Adrean. In particular, the Commission found incredible Jones' testimony that she did not have a relationship with Adrean because it was rebutted by her sworn petition for an order of protection stating Adrean was her ex-boyfriend who lived with her. Additionally, the Commission found Jones admitted using another person's Link card, even if only for the purchase of a drink. This constituted fraud in violation of section V(1) of the Handbook.

¶ 37    3. *Charges 3 and 3(d)—Benefits for Jacqueline Bridges*

¶ 38    a. The Evidence

¶ 39    In a review Strickland provided to Spears, Strickland stated Jones failed to include any case notes explaining the reasons behind the authorization of SNAP benefits for Jacqueline, Betty's daughter. The lack of a case note violated Guide section 01-04-03 and Manual section 01-04-00, which required the employee to record all actions taken on an application, including an explanation as to why an application for benefits had been accepted or denied. Diane Sikorski, a former coworker of Jones' from Human Services, testified she was

unaware of anyone ever being disciplined for failing to enter a case note. Moreover, Strickland testified, by authorizing benefits for Jacqueline, Jones improperly acted under a conflict of interest. Jones admitted she authorized SNAP benefits for Jacqueline after an intake worker forgot to do so. She also admitted she failed to provide case notes when she approved those benefits.

¶ 40                                b. The Commission's Finding

¶ 41        The Commission found Jones committed misconduct with regard to charges 3 and 3(d) by authorizing benefits for Betty's daughter, as she operated under a conflict of interest in violation of section V(3) of the Handbook. Jones' failure to make a case note that she authorized benefits for her aunt's daughter also violated manual section 01-04-00 and Guide section 01-04-03.

¶ 42                        4. *Charge 3(a)—Benefits for Antoinette Burts*

¶ 43                                a. The Evidence

¶ 44        Strickland testified her records reflected Jones authorized SNAP benefits for Antoinette, Charlene's daughter, which were later reduced prior to those benefits being paid. Jones admitted she approved benefits for Antoinette; however, not for the full amount alleged.

¶ 45                                b. The Commission's Finding

¶ 46        The Commission determined the Department partially proved Charge 3(a) as a conflict of interest in violation of section V(3) of the Handbook for authorizing benefits for Charlene's daughter.

¶ 47                        5. *Charge 3(b)—Benefits for Kiewann Poindexter*

¶ 48                                a. The Evidence

¶ 49        In a review Strickland provided to Spears, Strickland stated Jones failed to include any case notes explaining the reasons behind the authorization of SNAP benefits for Kiewann. The lack of a case note violated Guide section 01-04-03 and Manual section 01-04-00, which required the employee to record all actions taken on an application, including an explanation as to why an application for benefits had been accepted or denied. Jones admitted she approved benefits for Kiewann, who was Charlene's daughter and Jones' former coworker at Kohl's. She also admitted she failed to provide case notes for the authorization of those benefits.

¶ 50                          b. The Commission's Finding

¶ 51        The Commission found the Department proved Jones acted under a conflict of interest in violation of section V(3) of the Handbook for authorizing benefits for Kiewann, Charlene's daughter. Jones' failure to make a case note that she authorized benefits also violated Manual section 01-04-00 and Guide section 01-04-03.

¶ 52        6. *Evidence Regarding Charge 3(c)—Benefits for Danita Phillips*

¶ 53                          a. The Evidence

¶ 54        In the review Strickland provided to Spears, Strickland stated Jones failed to include any case notes explaining the reasons behind the authorization of SNAP benefits for Danita. The lack of a case note violated Guide section 01-04-03 and Manual section 01-04-00, which required the employee to record all actions taken on an application, including an explanation as to why an application for benefits had been accepted or denied. Jones admitted she approved benefits for Danita and failed to create a case note explaining the reason for the authorization.

¶ 55                          b. The Commission's Finding

¶ 56    The Commission determined the Department proved Jones failed to make a case note regarding her involvement with Danita's benefits.

¶ 57    7. *Charge 3(g)—Benefits for Frances Williams*

¶ 58    a. The Evidence

¶ 59    In a review provided by Strickland to Spears, Strickland stated Jones failed to include any case notes explaining the reasons behind the authorization of SNAP and TANF benefits for Frances, a high school classmate.  The lack of case notes violated Guide section 01-04-03 and Manual section 01-04-00, which required the employee to record all actions taken on an application, including an explanation as to why an application for benefits had been accepted or denied.  Additionally, Strickland testified Jones failed to obtain supervisory approval prior to issuing the TANF transportation and childcare benefits, in violation of Manual sections 21-05-02 and 21-05-01.  Jones admitted she approved TANF transportation and childcare benefits for Frances.  She did not recall obtaining supervisory authorization for those benefits.  Jones also could not recall whether she made any case notes on Frances' file, due to the length of time that had elapsed.

¶ 60    b. The Commission's Finding

¶ 61    The Commission found Jones failed to obtain supervisory approval for authorizing TANF childcare and transportation benefits for Frances in violation of Manual sections 21-05-01 and 21-05-02.

¶ 62    8. *Discharge*

¶ 63    a. The Evidence

¶ 64    Barb Radke, the senior public service administrator over customer service for the Department and Jones' supervisor, testified she was "appalled" at the charges levied against

Jones. Because the charges alleged the misuse of State funds, Radke was concerned Jones' access to the child-support system at the Department could lead to similar abuse of State funds. Radke testified Jones had the ability to change payment obligations within the program, and such misconduct would not be easily discovered absent a case-by-case review. Also, because Jones held the highest paraprofessional title in the Department, she had free reign over the system. Accordingly, Radke felt discharge was appropriate given Jones' position of public trust with confidential information.

¶ 65 Kathy Segobiano, an executive level II for the Department, testified she trained child-support specialists regarding the processing of payments. According to Segobiano, child-support specialists are trained in processing child-support payments. However, as Jones was assigned to process intergovernmental payments, her responsibilities would extend to transferring documents, not payments. Thus, although Jones would have the ability to create and send out payments, she would not have the training to do so. The extent of her authority would be to increase or decrease child-support balances when transferring documentation to out-of-state courts and agencies.

¶ 66 b. The Commission's Finding

¶ 67 In considering whether discharge was the appropriate sanction, the Commission expressed concern that Jones (1) was discharged in 2012 for misconduct occurring in 2008, (2) had no prior discipline while at Human Services, and (3) did not authorize state benefits in her position with the Department. Despite those concerns, the Commission found discharge was appropriate because, regardless of the department with which she was associated, Jones was, at all relevant times, an employee of the State of Illinois. Though each violation alone was insufficient to warrant discharge, the pattern of violations, wherein Jones fraudulently provided

- 16 -

benefits to her friends, warranted discharge. The Commission found the outcome might have been different had Jones been honest about her associations with her friends and family. Instead of showing a temporary lapse of judgment, the Commission determined her dishonesty demonstrated she was "an intelligent individual willing to manipulate the system in violation of the rules to benefit herself and her friends." Thus, the Commission found "Jones' proven conduct amounts to a substantial shortcoming detrimental to the discipline and/or efficiency of the service and which sound public opinion recognizes as good cause for her discharge from her position at [the Department]."

¶ 68                    C. Administrative Review in the Circuit Court

¶ 69          In November 2012, Jones filed a complaint for administrative review in the Sangamon County circuit court. Therein, Jones asserted the Commission's decision should be reversed as (1) contrary to law, (2) an abuse of discretion, (3) against the manifest weight of the evidence, and (4) improperly relying on written policies implemented after Jones' alleged misconduct. In a supporting memorandum, Jones argued the evidence was insufficient to support the Commission's finding of misconduct and, even if sufficient evidence existed, the Commission's decision to uphold Jones' discharge from the Department was arbitrary and unreasonable. In November 2013, the Department and members of the Commission filed a brief in support of the administrative decision.

¶ 70          In March 2014, the circuit court upheld the Commission's finding of misconduct but found no cause for Jones' discharge. Accordingly, the court remanded the case to the Commission for imposition of a sanction other than discharge. In July 2014, the Department filed an objection to the Commission reducing Jones' sanction to a 90-day suspension. In

September 2014, the court found the 90-day suspension was in conformity with the law and not an abuse of discretion, and ordered the parties to immediately comply with the court's order.

¶ 71    This appeal followed.

¶ 72                II. ANALYSIS

¶ 73    On appeal, the Department asserts the Commission properly discharged Jones. Jones cross-appeals, arguing (1) the Department's claim should be barred by the doctrine of *laches*, (2) insufficient evidence existed to support the Commission's findings of misconduct, and (3) the findings of misconduct were inadequate to support just cause to discharge her from employment.  We begin by addressing Jones' cross-appeal.

¶ 74                A. *Laches* Defense

¶ 75    Jones first argues the four-year gap between her alleged misconduct and her discharge prejudiced her ability to defend herself and therefore should be equitably estopped by the doctrine of *laches*.  The Department, on the other hand, asserts the issue is forfeited because Jones failed to raise it during the administrative proceedings.  See *Gruwell v. Department of Financial & Professional Regulation*, 406 Ill. App. 3d 283, 297, 943 N.E.2d 658, 671 (2010) (the failure to raise an issue during administrative proceedings results in procedural default).

¶ 76    In this case, Jones did not specifically file an affirmative defense asserting a *laches* defense, nor did she assert the entire proceeding should be barred under the doctrine of *laches*.  To prove the equitable defense of *laches*, Jones would have the burden of showing (1) the Department demonstrated a lack of diligence in bringing the suit and (2) the Department's delay prejudiced her.  See *Valdovinos v. Tomita*, 394 Ill. App. 3d 14, 18, 914 N.E.2d 221, 226 (2009).

¶ 77 Generally, it is not our function to consider a defense not asserted during the administrative proceedings. Jones' failure to raise this issue during the administrative proceedings deprived the Department of the opportunity to gather and present evidence to potentially overcome this defense. If we were to consider Jones' *laches* defense, we would then have to speculate regarding the Department's response to the *laches* defense. Because Jones failed to specifically raise a *laches* defense before the Commission, we conclude she forfeited the issue.

¶ 78 B. Violation of Human Services Policies

¶ 79 Jones next asserts insufficient evidence was presented to support the Commission's finding that she violated any Human Services policies.

¶ 80 In reviewing the Commission's decision, we engage in a two-step analysis. *Ehlers v. Jackson County Sheriff's Merit Comm'n*, 183 Ill. 2d 83, 89, 697 N.E.2d 717, 720 (1998). First, we must determine whether the finding of misconduct was contrary to the manifest weight of the evidence. *Id.* If not, we then determine whether the facts supported the Commission's finding that cause existed to terminate Jones' employment. See *id.* at 89, 697 N.E.2d at 721. Thus, we turn to each of the charges upon which the Commission found misconduct. "A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544, 866 N.E.2d 137, 145 (2007).

¶ 81 1. *Charges 1 and 2*

¶ 82 Charges 1 and 2 were partially intertwined, and alleged Jones improperly authorized benefits for her friends and family, which she then utilized for her personal benefit.

More specifically, these charges allege Jones engaged in the unauthorized use of another individual's Link card.

¶ 83        The allegations arose in two different instances. First, the Department alleged Jones used Adrean's Link card to purchase two cookie cakes that were subsequently served at a Human Services office party. An employee later discovered a receipt for the two large cookies in an employee-only area, and the receipt shows those cookies were paid for with Adrean's Link card. Jones testified the time on the receipt of 11:55 a.m., minutes before the beginning of the party at noon, demonstrated the recovered receipt was not for the cookie cakes she purchased, because she could not have returned to the office in time for the party. Strickland, however, testified she recalled Jones arriving at the party approximately 15 or 20 minutes late with two cookies in hand. When Strickland later e-mailed Jones about the cookies, Jones replied she purchased them the evening before. Jones also provided differing stories regarding the cookies. Until reading the e-mail, she did not recall purchasing the cookies, and thought perhaps Charlene had purchased them for her using a Link card.

¶ 84        Though no witness personally witnessed Jones purchase the cookie cakes with Adrean's Link card, the circumstantial evidence was substantial. The receipt reflected the purchase of the two large cookie cakes on the day of the party. Notably, no other employees brought cookie cakes to the party. Strickland specifically remembered Jones carrying in the cookies. Human Services' records also demonstrate Adrean left an application for benefits with the office that day. Additionally, Jones had a relationship of some nature with Adrean. Though she testified the extent of their relationship consisted of him visiting her house on four occasions, a verified petition for an order of protection she filed against him classified him as an ex-boyfriend who resided in her home. Jones acknowledged making misrepresentations on her

verified petition for the order of protection to increase her chances of success before the trial court.

¶ 85        From this evidence, the Commission could find Jones' testimony regarding her relationship with Adrean incredible and reasonably infer Jones engaged in the unauthorized use of another's Link card. This finding was not against the manifest weight of the evidence.

¶ 86        Jones asserts the poor memories of the investigators and the Commission's finding that Strickland was overzealous kept the Department from proving its case. However, the memories of the investigators were often refreshed from their investigative notes. Also, the credibility of Strickland versus Jones was for the Commission to determine. See *Maun v. Department of Professional Regulation*, 299 Ill. App. 3d 388, 401, 701 N.E.2d 791, 801 (1998) ("It is for the hearing officer, as the trier of fact, to evaluate all evidence, judge the credibility of witnesses, resolve any conflicts in the evidence, and draw reasonable inferences and conclusions from the facts."). Because Jones' credibility was significantly impeached by her prior misrepresentations to another court, the Commission's rejection of her testimony and acceptance of Strickland's testimony was not against the manifest weight of the evidence.

¶ 87        Second, Jones allegedly admitted using a Link card Charlene provided her to buy a beverage. Both investigators from the Office of the Executive Inspector General testified they recalled Jones admitting she used a Link card Charlene provided her to purchase a beverage, and this recollection was independent from their investigative notes. Though Jones denied making this statement and her union steward believed the statement had been taken out of context, the Commission again considered the believability of the witnesses and the accuracy of their various notes. The Commission was also not required to believe Charlene's testimony that she never provided Jones with a Link card. See *id.* Thus, the Commission's finding of misconduct on this

charge based on a violation of section V of the Handbook was not against the manifest weight of the evidence.

¶ 88                              2. *Charges 3 and 3(d)*

¶ 89        In charge 3 and its subparts, Jones was charged with improperly authorizing benefits for various individuals.  In all of these incidents, the Commission determined the amounts she authorized were not improper, but either (1) her act of authorizing payments for a friend or relative was improper, or (2) she failed to make the required case notes.  Jones asserts the Commission's findings were not charged in charge 3 or its subparts, so the Commission erred in finding misconduct on those other grounds.  Instead, those charges were contained in charges 4, 5, and 6.  However, Shawgo, who drafted the charges, clarified charges 4, 5, and 6 were redundant of charge 3.  Moreover, the paperwork outlining the charges against Jones specifically listed the violations of the various guides and manuals related to conflicts of interest and the recording of case notes.  The ALJ stated, "[c]harges 4, 5, and 6 do not specifically address the individuals who were authorized benefits in violation of [Human Services'] rules.  In addition, these charges generally allege the *same allegations* covered by the previous three charges." (Emphasis added.)  This is consistent with the Commission entering its order with respect to charges 1, 2, and 3, but stating nothing as to charges 4, 5, and 6.

¶ 90        As to charge 3, Jones does not specifically challenge the Commission's finding of misconduct, which alleges she improperly authorized benefits for Jacqueline, a relative.  On her emergency contacts, Jones listed Betty as her aunt.  The Commission found incredible Jones' attempt to downplay her relationship with Betty.  Accordingly, Jones violated the conflict-of-interest provision of section V of the Handbook when she provided benefits to Betty's daughter, Jacqueline.  Her failure to make a case note on the case acknowledging that relationship and

- 22 -

explaining the reasoning behind the authorization of benefits also violated Manual section 01-04-00 and Guide section 01-04-03. The Commission's finding of misconduct as to this charge was not against the manifest weight of the evidence.

¶ 91　　　　　Under charge 3(d), the Commission found Jones improperly authorized benefits for Jacqueline. This mimics charge 3. As Jacqueline was the daughter of the person she listed as her aunt, Jones had a conflict of interest that should have precluded her from authorizing any benefits on her behalf, particularly where she entered no case note outlining the connection. Thus, the Commission's finding that she violated Manual section 01-04-00, Guide section 01-04-03, and section V of the Manual was not against the manifest weight of the evidence.

¶ 92　　　　　　　　　　　3. *Charge 3(a)*

¶ 93　　　　　Charge 3(a) alleged Jones improperly authorized SNAP benefits for Antoinette, the daughter of her friend, Charlene. The Commission found Jones violated section V(3) of the Handbook because she acted under a conflict of interest without receiving clearance from her supervisor to do so. Though the Commission found the authorized amount was not proved improper, the fact that Jones authorized, or attempted to authorize, any payments for the daughter of her friend was a conflict of interest. Given Jones shared a close enough relationship to Charlene to include her on her emergency-contact form, the Commission's finding of misconduct was not against the manifest weight of the evidence.

¶ 94　　　　　　　　　　　4. *Charge 3(b)*

¶ 95　　　　　Charge 3(b) alleged Jones improperly authorized SNAP benefits for Kiewann, Charlene's daughter. As with Antoinette, the Commission determined Jones close relationship with Charlene prohibited Jones from authorizing benefits for Charlene's family under section V of the Handbook. Jones also admitted working with Kiewann at Kohl's prior to accepting a job

- 23 -

with Human Services.  Moreover, Jones admitted she did not have any case notes explaining her authorization of benefits in violation of Manual section 01-04-00 and Guide section 01-04-03.  Thus, the Commission's finding of misconduct was not against the manifest weight of the evidence.

¶ 96                                                    5. *Charge 3(c)*

¶ 97            Under charge 3(c), the Commission determined Jones failed to make the proper case notes when making SNAP benefit authorizations for Danita, in violation of Manual section 01-04-00 and Guide section 01-04-03.  Jones admitted she neglected to enter case notes for Danita; thus, the Commission's finding was not against the manifest weight of the evidence.

¶ 98                                                    6. *Charge 3(g)*

¶ 99            Under charge 3(g), the Commission found Jones improperly authorized numerous benefits for Frances Williams, including TANF transportation and child-care benefits, in violation of Manual sections 21-05-01 and 21-05-02.  Jones did not challenge this finding before the circuit court or on appeal.  Thus, it is deemed forfeited.  See *People ex rel. Ballard v. Niekamp*, 2011 IL App (4th) 100796, ¶ 40, 961 N.E.2d 288 (issues not raised before the circuit court are deemed forfeited on appeal).

¶ 100           Having determined the Commission's findings of misconduct were not against the manifest weight of the evidence, we next must determine whether cause existed to terminate Jones' employment.  *Ehlers*, 183 Ill. 2d at 89, 697 N.E.2d at 721.

¶ 101            C. The Commission's Decision To Terminate Jones' Employment

¶ 102           The Department asserts the Commission properly found termination was an appropriate sanction for Jones' misconduct.  Jones, on the other hand, asserts the circuit court

correctly reversed and remanded the decision for the imposition of a lesser sanction, ultimately a 90-day suspension.

¶ 103    In determining whether cause existed to terminate employment, we define "cause" as "some substantial shortcoming which renders continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his not longer occupying the place." (Internal quotation marks omitted.) *Id.* On review, we will not overturn an agency's finding of just cause unless that finding is arbitrary and unreasonable, or unrelated to the requirements of the employee's current position. *Id*.

¶ 104    Jones argues only a few of the charges were proved, and only partially proved at that. While technically true, as noted above, the Commission considered charges 4, 5, and 6 as redundant to charge 3 and therefore incorporated them under charge 3. According to Jones, the violations also constituted minor infractions not rising to the level of termination. In particular, Jones points out that, even after these violations occurred, she remained with Human Services for nearly two more years before transferring to the Department, where she received no discipline.

¶ 105    Although the Commission noted Jones' lack of disciplinary history at the department in deliberating on whether termination was the appropriate sanction, ultimately, the Commission found it to be the correct course of action. In issuing his written findings, the ALJ noted,

> "Maybe if Jones was more forthcoming about her involvement
> with a Link card(s) and more honest about her relationship with
> Charlene Poindexter and Betty Bridges, lesser discipline would be
> warranted, i.e., Jones' conduct genuinely amounted to a

momentary, yet understandable, lapse in judgment involving a Link card(s) on top of simple neglect in making case notes. Instead, the evidence adduced at hearing revealed an intelligent individual willing to manipulate a system in violation of the rules to benefit herself and her friends. For these reasons, Jones' proven conduct amounts to a substantial shortcoming detrimental to the discipline and/or efficiency of the service and which sound public opinion recognizes as good case for her discharge from her position at [the Department]."

Moreover, the ALJ reasoned, Jones was a state employee, irrespective of whether she worked for the Department or Human Services. Thus, if discharge from Human Services would have been appropriate, discharge from the Department for actions occurring while Jones worked at Human Services was also appropriate.

¶ 106 Jones asserts her current position with the Department differed greatly from her position with Human Services because she was not able to authorize benefits with the Department. Rather, she simply reported child-court orders to intergovernmental jurisdictions. Jones' supervisor, Radke, disagreed, noting Jones had the ability to transfer funds, just not the authority. Moreover, according to Segobiano, who provided training for the Department, Jones had the ability to easily change orders and mark certain orders paid.

¶ 107 In light of the Commission's credibility determinations, specifically its finding of Jones' willingness "to manipulate a system in violation of the rules to benefit herself and her friends," we conclude the Commission's decision that discharge was an appropriate sanction was not arbitrary or unreasonable. Moreover, Jones's willingness to violate departmental policies

could easily transfer to her current position and, as Radke noted, remain undetected. Thus, we conclude the Commission's finding was not arbitrary and unreasonable, or unrelated to the requirements of the service. We therefore (1) reverse the circuit court's order remanding the case back to the Commission for imposition of a lesser sanction, (2) vacate the Commission's subsequent 90-day suspension sanction, and (3) reinstate the Commission's decision to terminate Jones' employment.

¶ 108                              III. CONCLUSION

¶ 109        For the foregoing reasons, we reverse the circuit court's judgment in part and reinstate the Commission's original order discharging Jones.

¶ 110        Circuit court judgment affirmed in part and reversed in part.

¶ 111        The Commission's initial order is reinstated.